KATHERINE M. VANDERLIPPE, EXECUTRIX, APPELLEE, v. MIDWEST STUDIOS, INC., ET AL., APPELLANTS.

289 N. W. 341

FILED DECEMBER 15, 1939. No. 30681.

*James J. Fitzgerald* and *Wear, Boland & Nye,* for appellants.

*Earl Hasselbalch* and *Tunison & Joyner, contra.*

Heard before SIMMONS, C. J., EBERLY, PAINE, MESSMORE and JOHNSEN, JJ., and KROGER and ELLIS, District Judges.

ELLIS, District Judge.

In this case the appellee, who was plaintiff in the court below, as the personal representative of the deceased, Benjamin R. Vanderlippe, sued on two counts to recover damages for alleged wrongful death. The first count was for damages recoverable under the statute for the benefit of the widow and next of kin, and the second count was for

damages for pain and suffering sustained by the deceased from the time of the injury until his death and for medical and burial expenses.

Upon trial the jury found against both defendants and fixed the amount of plaintiff's recovery on her first cause of action at the sum of $5,000 and on her second cause of action at the sum of $3,500. The defendants filed separate motions for new trial. Upon consideration thereof the trial court entered a conditional order overruling the motions, the condition being that plaintiff file a remittitur for $1,000 from the verdict and judgment. The plaintiff complied with the conditions and motions for new trial were overruled. The remittitur has been treated by the parties as applying to the recovery on the second cause of action. In her remittitur the plaintiff expressly reserved her rights under section 20-1929, Comp. St. 1929.

Both defendants have appealed and have filed separate briefs herein. The defendant Midwest Studios, Incorporated, a corporation, will hereinafter be referred to as "Midwest" and the defendant Fred Brinch as "Brinch."

The action arises out of an automobile collision which occurred in Boone county, Nebraska, on July 6, 1937, as a result of which plaintiff's deceased sustained injuries from which it is admitted he died on July 8, 1937.

In her petition plaintiff alleged that defendant Brinch was an agent and employee of defendant Midwest; that Midwest was the owner of the car being driven by Brinch at the time of the accident, and that it was then being used in the course of his employment; that the proximate cause of the accident and resulting injuries was the negligence of Brinch in operating said car, and specified as negligence (1) unlawful and negligent speed; (2) omission to sound horn; (3) failure to keep proper lookout and to have car under proper control; and (4) speed greater than proper and reasonable under the conditions.

By separate answer Midwest admitted Brinch was its employee, but denied that he was acting within the scope of his employment, and alleged that he was on a mission of

his own. It further denied negligence on its part and alleged that the proximate cause of the accident, resulting injuries and death was the negligence of plaintiff's deceased. The answer of Brinch. was in effect the same as that of Midwest.

At the close of all the evidence Midwest moved for a directed verdict on the grounds (1) that. the evidence affirmatively established that Brinch was not at the time and place of the accident engaged in the service or furtherance of the business of Midwest, but was on a mission entirely his own; and (2) that deceased was guilty of more than slight negligence. At the same time Brinch also moved for a directed verdict on the second ground assigned in Midwest's motion and for the further reason that plaintiff had failed to establish any act of negligence on his part.

Midwest assigns three errors in this court—the overruling of its motion on the ground first stated above; the overruling of its motion on second ground as stated above; and the overruling of the motion for new trial.

Brinch likewise assigns three errors in this court—separately assigning the overruling of his motion on two grounds stated therein and the overruling of his motion for new trial.

It thus appears that the defendants rely on substantially the same errors, except the assignment by Midwest that Brinch was not at the time acting within the scope of his employment, and we will discuss that assignment first.

Midwest is a corporation engaged in the portrait business. The business was obtained through salespeople or canvassers who obtained orders for portraits and frames and sent them in to the company where the work was done. At the head of the sales organization in the field there were division managers. Next under the division managers and subject to their directions came district managers and Brinch was one of these. Each district manager had under him several crews. A crew consisted of a varying number of people and was in general charge of a crew foreman. The foreman and crew members made the actual solicita-

tions of customers, although Brinch spent part of his time in the direct solicitation of customers and taking of orders. His time appears to have been divided between direct solicitation of orders and the supervision and stimulation of production of business by crews under him. He received a commission on the orders which he obtained as a result of his own solicitation and an "overwrite" or commission on all orders obtained by the individual members of the crews under him. As indicated above, both defendants admit by way of answer that Brinch was an employee of Midwest.

On July 6, 1937, Brinch was staying at a hotel in Central City. In the morning of that day he left Central City to go to Madison, and it was while on this journey that the accident occurred. He testified that he had a portfolio with some samples and business papers in it, but that he did not take it with him on that morning. There is no testimony however that he had any need for the portfolio or its contents when not actually soliciting orders himself and when engaged in the other part of his work consisting of supervision and stimulation of the work of his crews. Brinch gave as his reason for making the trip to Madison, "I was going to join Bob Burke." Burke was a crew foreman under Brinch. Brinch had no appointment with Burke and his going was just his own idea. Brinch stated that the word "join" had no particular meaning. Burke was going to send his wife home and wanted to talk to Brinch about it. Brinch was going to discuss that with Burke that day. Burke's crew consisted of Burke, his wife and one man and they had been working in Madison for a week or two. After testifying as above, Brinch later in his examination denied that Burke's wife was a member of his crew. Burke wanted to send his wife home and wanted to borrow the needed money from Brinch. Brinch later on personally made the loan and Burke repaid it to him. Brinch admitted that as district manager he was interested in seeing that Burke kept at work and that Burke's wife was not much assistance to him in his work. "Q. And you thought that Burke would do better work if he did not have his wife around,

did you? * * * A. Well, I imagine so. She did need a vacation; traveling on the road does get on a lady's nerves. Q. And you thought that the quality of Burke's work could be improved if his wife could be sent away for a while, did you? * * * A. It might help. * * * Q. Whenever you saw a crew foreman, such as Bob Burke, you, of course, discussed business with him, didn't you? * * * A. Yes—well, every time we got together we discussed something about business, certainly." On the morning in question the crew which was with Brinch in Central City all went out to work before he left, and while Brinch took no orders that morning, he said he would have if some one had come up and given him one.

Midwest had legal title to the car Brinch was driving, but had sold it to Brinch on a conditional sales contract, which was unrecorded, so that, in so far as public records were concerned, Midwest was the owner. Brinch had made payment direct to Midwest on the purchase contract. "Q. As I take it, the sole purpose of the company in buying this car was to furnish Fred Brinch with a car so that he could work? I don't want you to misinterpret that. Put it this way; the sole purpose was for there to be a car available that he could have or could buy? A. That is correct. He wasn't in a financial position to purchase it, and without a car he couldn't operate, and, of course, the more business the field got, naturally the more business we would have to take care of. Q. So that you people bought him a car in order that he could continue to work? A. Well, not that exactly. We bought him this car, which was a new car. If he had gone—if he had got one, I knew he would have got an old rattle-trap that would have a lot of expense attached to it. He could have worked just the same without this car. Q. But you did buy it for him for the purpose of his working? A. That is correct."

Brinch reported the accident to Midwest by letter dated July 6, 1937. In it he stated, as on the witness-stand, that he was going "to join Bob Burke," but did not further amplify the purpose of his trip. He made no suggestion

that the trip was solely for personal reasons and said nothing to indicate that it was not in the course of and in connection with his work. He reported the damage to his car, estimated costs of repair at $100, transmitted offers by car dealers to exchange cars, and asked for instructions. Midwest sent Brinch a check for $100 to pay for repairs to his car and charged it to Brinch's division manager's account.

On this record Midwest insists that the question of whether Brinch was acting within the scope of his employment was one for the court, and that the trial court erred in not determining the question and determining it in favor of Midwest. This contention seems to be based on the assertion that there is no conflict in the testimony. With the latter assertion we are unable to agree. There is the conflict arising from Brinch's own testimony as to whether Mrs. Burke was or was not a member of Burke's crew. The triers of fact could choose between his conflicting statements. If she was a member of the crew, then certainly it would be a proper inference that her going directly affected the business of the Midwest. If she was not a member of the crew, there were the alternative inferences, either that her going was a private matter not affecting Midwest's business or that if she was sent away it might enable Burke to do better work. While Brinch patently sought to establish that the trip was for purely personal reasons, he admitted that when he got with a crew foreman they discussed business.

In *Harrell v. People's City Mission Home,* 131 Neb. 138, 267 N. W. 344, the court said: "A servant may on the same trip combine both his own and his master's business," and cited *Lytle v. Union Gas & Electric Co.,* 24 Ohio App. 314, 157 N. E. 804, and *McCormack Bros. Motor Car Co. v. Holland,* 218 Ala. 200, 118 So. 387. In *Primos v. Gulfport Laundry & Cleaning Co.,* 157 Miss. 770, 128 So. 507, it was held that an employee was acting within the scope of his employment where he was using his employer's truck partly for his own pleasure to attend a dance with his wife

and partly for his employer's benefit by soliciting business while at the dance.

The instant case is not like those of *Harrell v. People's City Mission Home, supra,* the companion case of *Parker v. Harrell,* 131 Neb. 147, 267 N. W. 348, and *Wise v. Grainger Bros. Co.,* 124 Neb. 391, 246 N. W. 733 (all cited by Midwest), in all of which cases the evidence was undisputed and without conflict that the employee was engaged solely on his own business. There was no evidence from which any contrary inference could properly be drawn. In such cases it goes without saying that the trial court, not only is justified, but should say as a matter of law that the employer is not liable.

Midwest cites the following rule and comment from 1 Restatement, Agency, sec. 235: "An act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of *or incident to* a service on account of which he is employed." (Italics ours.) "Comment: a. The rule stated in this section applies, although the servant would be authorized to do the very act done if it were done for the purpose of serving the master, and although outwardly the act appears to be done on the master's account. It is the state of the servant's mind which is material. Its external manifestations are important only as evidence. *The act is within the scope of employment only if the servant is actuated to some extent by an intent to serve his master.* However, it is only from the manifestations of the servant and the circumstances that, ordinarily, his intent can be determined. *If, therefore, the servant does the very act directed, or does the kind of act which he is authorized* to perform within working hours and at an authorized place, *there is an inference that he is acting within the scope of his employment.*" (Italics ours.)

We think the rule is sound and applicable, but that it does not support appellants' contention. We cannot say, as a matter of law, that Brinch's trip was not incident to the service on account of which he was employed. Neither can we say that he was not actuated at least to some extent

by an intent to serve his master. It certainly does no violence to logic to conclude from the record that, if Brinch had no other purpose in making the trip than personally to discuss with Burke the matter of his wife's trip, he was influenced to do this for the broad purpose and with the intention of promoting and furthering the interests of his employer. His own testimony directly supports such an inference. We are unable to say that different minds might not properly draw different conclusions from the evidence and we certainly cannot say that the jury's determination against Midwest was without foundation in the evidence.

In the case of *LeFleur v. Poesch*, 126 Neb. 263, 252 N. W. 902, this court cited with approval as a general rule of law applicable in cases like this the rule stated in *Stone v. Hills*, 45 Conn. 44, 29 Am. Rep. 635, which is as follows: "For all acts done by a servant in obedience to the express orders or directions of the master, *or in the execution of the master's business*, within the scope of his employment, and for acts *in any sense warranted* by the express or *implied* authority conferred upon him, considering the nature of the services required, the instructions given, and the circumstances under which the act is done, the master is responsible; for acts which are not within these conditions the servant alone is responsible." (Italics ours.) The rule applies in this case, and what this court said immediately following the citation of the rule is controlling in the instant case: "Whether the act was done in the execution of the master's business, within the scope of his employment, is a question of fact. The rule cannot aid in the determination of the fact. Each case must be determined with a view to the surrounding facts and circumstances, the character of the employment and the nature of the wrongful act. Whether the act was or was not such as to be within the scope of his employment is, ordinarily, one of fact for the determination of the jury."

We now turn to the contention of both defendants that the deceased was guilty of more than slight negligence as a matter of law and that the trial court erred in not sus-

taining defendants' motions for a directed verdict on that ground. In considering this assignment it is necessary to set forth the substance of the evidence bearing on the collision. The accident occurred in the approximate center of the intersection of highways Nos. 14 and 56. No. 14 runs north and south and No. 56 runs east and west. The deceased was proceeding west on No. 56 and at the point of collision the left wheels of his car were approximately on the center line of the roadway. Brinch was proceeding north on No. 14 and the left wheels of his car were approximately on the center line of the roadway. It thus appears that each driver was on his own side of the road. The roads as they approached the intersection were of normal width (approximately 22 feet), but all four corners of the intersection had been cut back or rounded off so that the area of the intersection was substantially greater than the square of the width of the highways. On the southeast corner of this intersection there was a bank higher than a car. This bank had the equal effect of obscuring the view of the deceased to the south and the view of Brinch to the east, as each driver approached the intersection. No. 56 as it approaches the intersection from the east is upgrade. It levels off in the intersection, then is downgrade to the west. No. 14 from the south is upgrade until a point about 75 to 100 feet south of the intersection is reached, when the traveler comes over a "kind of a crown of the hill." Another witness stated it was 325 to 350 feet from the crest of the hill to the center of the intersection. Still another witness placed the top of the hill as 250 feet south of the center of the intersection. On approach to the intersection on No. 14 from the south there are several highway signs, first, a "slow" sign, then a "state highway 200 ft." sign, then two signs with highway numbers and directional arrows on them, and then one indicating towns, directions and distances, the latter being nearest the intersection. The same number and kind of signs are located on No. 56 as it approaches the intersection from the east. Approaching the intersection from the east on No. 56 one

could not see the crest of the hill to the south on No. 14 until within 30 to 35 feet of the center of the intersection. From a point 25 feet south of the center of the intersection one could see east on No. 56 a quarter of a mile. From a point 50 feet south of the center of the intersection one could see east on No. 56 to the 200 foot highway sign. From a point 250 feet south of the center of the intersection one could see east on No. 56 60 to 70 feet from the center of the intersection. Cars coming from the north are not required to come into this intersection in order to proceed west, but about 150 feet north of this intersection a road branches off to the west and south and in a sweeping curve connects with No. 56 to the west of the intersection formed by the right angle crossing of Nos. 56 and 14. The curved road forms one leg of a Y to the north and west of the intersection. The space in between the right angle formed by the crossing of Nos. 56 and 14 and the curved road is referred to by the witnesses as an island.

The car that the deceased was driving was struck approximately in its center on the left side. The damage to Brinch's car was largely confined to its front end. After the collision the Vanderlippe car moved in a northwesterly direction about 60 feet and came to rest on its left side in the island above referred to and 10 to 12 feet off the gravel. The rear end of Brinch's car turned to the east and after being turned around one or more times came to rest headed south in the ditch on the west side of No. 14, 80 to 90 feet north of the intersection. There were no tire marks of the Vanderlippe car east from the point of impact. There were tire marks made by Brinch's car and they extended from about the center of the intersection south 12 to 14 feet to about the south edge of the intersection.

The accident occurred about 10:30 in the morning on a "nice, clear summer day." The witness McClung was riding with the deceased and had a case pending as a result of the same accident. He testified that as they approached the intersection the deceased slowed down and came practically

to a stop—down to 5 miles an hour; that you could not see to the south until you approximately reached the circle or widening of the intersection resulting from rounding the corners. McClung looked to the north and saw a car just starting to turn off to the southwest on the Y above referred to. He looked to the south, estimated that he could see about 250 feet to the top of the hill and saw no car. After slowing down, as above stated, deceased proceeded across, gaining a little speed ("probably to 10 miles an hour") in the few feet before the car was struck. When they reached a point a little past the center of the intersection, witness glanced to the south and saw a car right on them—maybe ten feet away. The crash followed immediately. He was rendered unconscious for a time by the force of the collision. He testified that the brakes on the Vanderlippe car were working all right. He thought that at 5 miles an hour the car could be stopped almost immediately—within a foot or two.

Brinch testified that, when he reached the sign showing towns, directions and distances, he stopped to ascertain the closest way to Madison and estimated this sign as 100 feet or so south of the intersection. He then put his car in low gear, shifted to second, then to high and started downhill. No car was coming from the west, but he could not see to the right or east. He took his foot off the accelerator and kept looking until he could see around the bank on his right. He was two to four feet from the edge of the intersection when he first could see to the east. At this point he saw a cloud of dust and a car 50 feet east of the east line of the intersection. He kept looking at the car and also put on his brakes as hard as he could. He had driven three to four hundred thousand miles and estimated the speed of the other car at 50 miles an hour, at least. This speed was not reduced up to the time of the collision. Just before the impact he saw the driver of the other car talking to the man beside him; that is, he saw him turn his head toward his companion. He estimated his speed, when he entered the intersection, at 15 miles an hour and at the

time of the impact at 5 to 7 miles an hour. His brakes were good. He thought that at 15 miles an hour he could stop within 12 to 15 feet. There was some conflict between statements in his letter reporting the accident to Midwest and his cross-examination on the stand as to whether the Vanderlippe car moved straight west up to the time of impact or swerved to the north just before the impact. His final position seems to have been that it turned to the north somewhat.

The witness Closson was coming south on No. 14 on his way to Cedar Rapids, which is west of the intersection in question. Instead of coming south to the intersection, he turned off to the west on the cut-off or Y above referred to. He estimated the cut-off started at a point 200 feet north of the intersection and that the curve was 100 yards, more or less, from where it turned from No. 14 to where it joined No. 56. Just before turning he was looking to the south and could see to the top of the hill south of the intersection. He saw no car coming from the south, but did see a car headed west on No. 56 not to exceed 50 feet east of the center of the intersection. He could not say whether it had "clearly stopped or was just moving * * * but it was not moving at a rapid rate." He moved around the curve at 15 to 20 miles an hour and after traversing the curve as he headed west he heard a crash and in his rear-view mirror saw a big cloud of dust. He drove on possibly 200 yards, turned around and came back to the intersection, where he saw the results of the collision. He did not see any other car in the vicinity of the intersection before the collision, and the evidence clearly indicates he could see all of No. 56 west of the intersection to the point where he entered it to the west of the intersection.

The actual conflict between the testimony of the witnesses McClung and Brinch is apparent. We think the innumerable conflicting inferences which different minds might properly draw from the testimony and the physical facts are likewise apparent. These conflicts could only be resolved by a determination of credibility and the corroborative influence

of all the facts and circumstances proved. The testimony of Closson certainly tends to corroborate the testimony of McClung. If Closson, who had a perfect view to the south on No. 14, did not see the Brinch car, it was not within the view of the deceased. Closson's testimony corroborates McClung's testimony as to the slowing down of the Vanderlippe car before entering the intersection and flatly contradicts Brinch's estimate that its speed was at least 50 miles an hour. If Brinch's car was not in sight when the Vanderlippe car reached the intersection, its driver had a right to proceed on through the intersection. There is no denial in the evidence that it had reached the center of the intersection at the time of the collision. That it was farther through the intersection than the Brinch car is clearly established by all the witnesses as well as the point of impact of the Brinch car against it.

There would be no point in further discussion of the conflicts in the testimony and conflicting inferences arising from it. Suffice it to say, we conclude that determination of responsibility for the accident was for the jury, and that the evidence did not justify the trial court in saying as a matter of law that the negligence, if any, of the deceased was more than slight.

The defendants rely on the decisions of this court in *Nelson v. Plautz*, 130 Neb. 641, 265 N. W. 885, *Ritter v. Hering*, 135 Neb. 1, 280 N. W. 231, and *Bergendahl v. Rabeler*, 133 Neb. 699, 276 N. W. 673. All these cases turned on the facts, and in each this court determined that the plaintiffs either did not look or that, notwithstanding claims of looking, the driver failed to see what was in plain sight. The essence of the rule developed by these cases was the failure to look (or to see what was in sight) where looking would have been effective.

The contention of the defendants necessarily involves the contention that the facts in the cases last above cited were similar to the facts in the case at bar. We think the evidence amply supports a finding in conflict with defendant's contention. In the cases cited the physical facts of

the grades of intersecting roadways compelled the conclusion that the drivers did not look or did not see where looking and seeing would have been effective. In the instant case the hill crest south of the intersection beyond which a car coming from the south could not be seen is a physical fact clearly distinguishing this case from those cited. The question of whether a driver looks, obviously, only becomes of controlling importance where looking would be effective. By this statement we do not wish to be understood as suggesting that there are ever any circumstances where a motorist is justified in not maintaining a constant lookout in all directions from which danger may come. We simply mean that if the Brinch car was not over the crest of the hill and in sight when the Vanderlippe car approached the east line of the intersection, as both McClung and Closson testified, then the absence of direct testimony that the deceased looked to the south is not controlling. Paragraph 3 of the syllabus in the *Bergendahl* case, *supra,* imposes the duty to see what is in plain sight *unless some reasonable excuse for not seeing is shown.* The hill crest in the instant case is within the exception. If no car was visible in the space south to the hill crest, when the Vanderlippe car approached the edge of the intersection, it had a right to proceed. Any other rule would render No. 56 from the east useless for travel. The Vanderlippe car had the right of way over traffic from the south and had the right to assume that motorists from that direction approaching an intersection, which was a blind one to them, would approach with their cars under such control that they could yield that right of way. We cannot escape the conclusion that the jury were justified in finding that Brinch did not heed the slow and intersection warning signs and his inability to see the intersection which the sign warned was within 200 feet and came over the crest of the hill at too great a speed. On the facts we conclude that the cases cited are not controlling and that the assignment last discussed is not well taken.

What precedes disposes of all assignments of error made

and discussed by Midwest and all assignments made by Brinch except the general one that the trial court erred in overruling his motion for a new trial. Under the rules of this court respecting assignments of error relied on, we are not required to consider the remaining contentions of error made by the appellant Brinch *only* by way of argument. See *Kuhlman v. Schacht,* 130 Neb. 511, 265 N. W. 549; *Currier v. Teske,* 98 Neb. 660, 154 N. W. 234. However, we will discuss them briefly. Appellant Brinch complains that the trial court erred in submitting to the jury the issue of excessive speed on his part. This contention is based on the fact that no witness other than Brinch himself testified directly as to the speed of his car. This position necessarily involves the contention that speed cannot be proved except by direct testimony. With this contention we cannot agree. "It is not essential to establish the negligence of a motorist, who has injured a traveler in the operation of his machine, that eyewitnesses of the accident be produced. Circumstantial evidence may constitute adequate proof of negligence." 10 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.) 152, sec. 6555. No further citation of authority is required to support our conclusion that speed, like any other act of negligence, may be proved by circumstances, the conclusions to be drawn from the circumstances being for the jury. The appellant Brinch cites *Knoche v. Pease Grain & Seed Co.,* 134 Neb. 130, 277 N. W. 798. The reversible error in that case resulted from the admission of the opinion as to speed of a motor vehicle of a witness who did not see the vehicle before the collision and who had no reasonable time, means, distance or opportunity from which to formulate an opinion as to speed. In that case it was contended that what the witness saw after the collision was sufficient to provide the foundation for his opinion as to speed. This court said: "Testimony based on these facts would be a mere conclusion of fact and *an attempt to impinge upon the province of the jury."* (Italics ours.) The opinion specifically holds "that this evidence was prejudicial to the rights of the defendant and constituted

reversible error." We do not find anything in the opinion holding that the issue of speed was improperly submitted in that case. Appellant Brinch cites paragraph 3 of the syllabus from this case, which is as follows: " 'Where a question of fact that is material to the case is submitted to the jury by the trial court, upon which there is no evidence to support a finding, it constitutes prejudicial error.' *Roseland v. Chicago, M., St. P. & P. R. Co.,* 130 Neb. 637, 265 N. W. 882." This paragraph of the syllabus was not prompted by the discussion on the issue of speed but referred only to the issue of defective brakes, on which point there was no evidence. The case is not authority against proof of speed by circumstantial evidence. The trial court did not err in the instant case in submitting the issue of the speed of the Brinch car to the jury.

Brinch complains that the court's instructions gave undue emphasis by way of repetition to the issue of Brinch's speed, and that prejudicial confusion resulted from giving two instructions the same number, which instruction number was referred to in a preceding instruction. The transcript before us does not exactly reflect the situation as described by appellant. In any event, we have examined the instructions complained of and conclude that there was neither prejudicial repetition nor confusion.

Brinch further complains of inflammatory and prejudicial statements by counsel for plaintiff in their arguments to the jury. Without extending this opinion by setting forth the statements complained of, we have no hesitancy in saying that the statements complained of were improper and ought not to have been made. Generally, such conduct on the part of counsel has but one rational effect, and that is to impeach counsel's faith in his own client's cause. If courts would inexorably give that effect to it, the result might be to develop uniform strength sufficient to resist a temptation unworthy of the profession. In the instant case the court was called, the statements read to him, and counsel for defendants asked the court to instruct the jury to disergard them. There were three such interruptions, and on each

occasion counsel for defendants only asked that the jury be instructed to disregard the remarks and for admonition of opposing counsel. No request that the court declare a mistrial was made. In each instance the court properly instructed the jury. From consideration of the whole matter, as reflected by the record before us, we conclude that it does not justify reversal.

Both Brinch and appellee complain of the remittitur required by the trial court. Appellee contends that no remittitur should have been required. Brinch contends the verdict on the second cause of action was grossly excessive and the result of passion and prejudice. He further contends that the remainder is still grossly excessive. A verdict which is deemed to have been the result of passion or prejudice cannot be purged of the inherent and fatal quality by remittitur. See *Collins v. Hughes & Riddle,* 134 Neb. 380, 278 N. W. 888. The verdict on the first cause of action was not in any sense excessive and could not possibly be ascribed to passion or prejudice. On the record, the verdict on the second cause of action is obviously disproportionate to the verdict on the first. We conclude that the verdict in question was not so grossly excessive as to indicate passion or prejudice. We approve the trial court's action in requiring a remittitur, but question the amount of the remainder. There is no question but what deceased sustained multiple injuries and suffered intense pain. He lived approximately 42 hours after the accident. He was given some, although not complete, relief by the use of morphine. He was not mentally clear at least two-thirds of the time. Damages for pain and suffering are not allowable during the time that the injured person is unconscious. See *Fries v. Chicago, R. I. & P. R. Co.,* 159 Minn. 328, 198 N. W. 998; *Stone v. Sinclair Refining Co.,* 229 Mich. 103, 200 N. W. 948. Allowance can only be made for pain and suffering of which the injured person is conscious. The only evidence of specific damage under this cause of action was burial and medical expenses in the amount of $650. After the remittitur and deduction of expenses proved, the

allowance for pain and suffering is $1,850. Considering all the factors involved, we are of the opinion that this is still excessive and that justice will be subserved by requiring a further remittitur of $500. The gross judgment of $7,500 will be affirmed to the extent of $7,000 if a remittitur of $500 (in addition to that filed in the district court) is filed herein within 30 days from the releasing of this opinion. Otherwise the judgment will be reversed and the cause remanded for further proceedings.

AFFIRMED ON CONDITION.