Cynthia AMBROSIO, Plaintiff,

v.

Francis R. PRICE, St. Isadore Church, a corporation, and the Catholic Archbishop of Omaha, Defendants.

No. CV78–L–50.

United States District Court, D. Nebraska.

Dec. 26, 1979.

Michael O. Johanns, Lincoln, Neb., for plaintiff.

J. Arthur Curtiss, Lincoln, Neb., for defendants Price and St. Isadore Church.

Philip M. Bowen, Omaha, Neb., for defendant The Catholic Archbishop of Omaha.

## MEMORANDUM ON MOTIONS FOR SUMMARY JUDGMENT

URBOM, Chief Judge.

The defendants The Catholic Archbishop of Omaha and St. Isadore Church, both corporations, have moved for summary judgment, filing 39. The plaintiff, Cynthia Ambrosio, has moved by filing 44 for summary judgment in her favor on the issues of the negligence of the defendant Father Francis R. Price, the negligence of Robert McNeely, and her assumption of the risk.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment is an extreme remedy, and where there is "any doubt as to the existence of a triable issue of material fact," it should not be exercised. *Jacobson v. Maryland Casual-*

*ty Co.*, 336 F.2d 72, 74 (C.A. 8th Cir. 1964). The moving party has the burden of "clearly establishing the lack of genuine issue of material fact." *Id.* Summary judgment should not be granted unless it is shown beyond all doubt that there is no room for controversy. *Rotermund v. United States Steel Corp.*, 474 F.2d 1139, 1143 (C.A. 8th Cir. 1973); *Williams v. Chick*, 373 F.2d 330, 331 (C.A. 8th Cir. 1967). Where the material facts are not in dispute, however, summary judgment shall be employed to avoid useless trials and the expenditure of judicial time. *Klinge v. Lutheran Charities Ass'n of St. Louis*, 523 F.2d 56, 61 (C.A. 8th Cir. 1975).

This diversity action grows out of a traffic accident involving an automobile driven by Father Price and a motorcycle driven by Robert McNeely in which the plaintiff, a passenger on the motorcycle, suffered various injuries. I shall consider first the defendants' motion.

## I.

The defendants The Catholic Archbishop of Omaha and St. Isadore Church argue that the defendant Francis R. Price, a Catholic priest at St. Isadore Church in Columbus, Nebraska, was not an agent for either of them at the time of the accident and was not acting within the scope of his agency for these defendants at the time of the accident.

For the plaintiff to recover from the Catholic Archbishop and St. Isadore Church for damages resulting from the alleged negligence of Father Price, she must show (1) that Father Price was an agent or servant of the other defendants at the time of the injury, and (2) that Father Price was then acting within the scope of his employment. *Sperry v. Greiner*, 175 Neb. 524, 529, 122 N.W.2d 463, 466 (1963). If Father Price took the trip during which the accident occurred for personal reasons, as opposed to business reasons, the plaintiff cannot recover from the employers of Father Price. The Supreme Court of Nebraska has made this point clear:

" . . . A principal is liable to third persons for the torts of his agent when committed in the course and within the scope of the agency, although the principal never authorized, participated in, or ratified the tort; but he is not liable where the tortious act was committed, not in furtherance of the principal's business, but for a purpose personal to the agent himself. . . . " *Wolfson Car Leasing Co., Inc. v. Weberg*, 200 Neb. 420, 427, 264 N.W.2d 178, 182 (1978).

### A.

The following undisputed facts may be drawn from an examination of the depositions and affidavits about the status of Father Price at the time of the accident, which occurred shortly after 7:00 p. m. on September 25, 1977:

Earlier in the day of September 25, Father Price had conducted mass at St. Isadore Church in Columbus, Nebraska. He had no appointments for that day after the completion of the last mass and decided to attend a dinner in Norfolk, Nebraska, which followed up a "marriage encounter" which had been conducted by another priest. Father Price had been invited to the dinner as a friend and he joined in a prayer after a request for prayers. His role at the dinner was as a guest; he did not attend it to discharge a priestly duty. After the dinner Father Price started back to Columbus on Highway 81 South. As he approached Madison, he decided to stop and see Mr. and Mrs. Leon Weiland and planned to return to St. Isadore Church to turn in for the evening after his visit with the Weilands; there were no evening services scheduled at the church. The accident occurred as Father Price was attempting to turn left into the Weilands' driveway.

The Weilands are Roman Catholics and are members of a parish other than St. Isadore. At one time they attended St. Isadore Church on a regular basis, but this was at least five years prior to the accident and they were never parishioners. At the time of the accident Father Price was paying a surprise visit to the

Weilands; the visit was not prearranged and he had nothing in particular to talk to them about. Although Father Price considers it one of his responsibilities as a priest to visit his parishioners, he stated that he had "no obligation . . . at all" to visit the Weilands.

Mr. Weiland was not expecting a visit from Father Price on September 25; their relationship was such that Father Price would just drop in "once in a while." The Weilands would see Father Price perhaps three times a year and they would discuss anything from "politics to church stuff;" there was "very little" talk about "church stuff" and Mr. Weiland described their relationship as "acquaintances" and "friends." Mr. Weiland also indicated that their relationship could fairly be characterized as a "social relationship," one which would entail the same sorts of conversations one would ordinarily have with neighbors.

St. Isadore Church held the title to the automobile Father Price was driving at the time of the accident, but Father Price paid for and maintained the vehicle personally out of his salary.

The Archbishop of Omaha is the head of the Catholic Church for the Omaha Archdiocese, which encompasses the geographical territory within which the relevant action took place. Upon entry into the priesthood, Father Price took a vow of obedience to the Bishop. The Archbishop, for example, could request a priest to perform duties outside his parish. Part of the duties of the Archbishop are to educate, care for, and be a good shepherd to the Catholics in his diocese. He is responsible for the spiritual welfare of his diocese. As a priest having taken a vow to the Archbishop, Father Price assists the Archbishop in carrying out his responsibilities.

Archbishop Sheehan, in an affidavit to the court dated October 8, 1979, filing 39, discusses the relationship between pastors and the bishop:

"The Canon Law theory which covers the relationship between pastors and bishop is accountability. Pastors are accountable to bishops while engaged in parochial functions related to the specific welfare of the parishioners in the definite defined area of their parishes. This would cover all matters involving the parish, parish facilities, and the carrying out of functions related to the spiritual welfare of the parishioners. A pastor is not accountable to the bishop in his private recreational and secular activities unless these actions would be detrimental to his effective functioning as a pastor and would make it difficult for him to carry out his responsibility as a spiritual father of his parishioners. These activities over which there would be some supervisory authority of the bishop are outlined in the Code of Canon Law.

"In practice, direction from the Archbishop to individual pastors involving pastoral duties and obligations is minimal. Most communications are general correspondence directed to pastors of all parishes in the Catholic Archdiocese of Omaha. . . ."

One expert indicated that priests assume the Bishop's ministerial role in a limited sense in their individual local congregations (affidavit of John T. Noonan, filing 49, pp. 4–5).

### B.

■ That the plaintiff may not successfully pursue the Catholic Archbishop of Omaha and St. Isadore Church is apparent from the foregoing facts. The trip to see the Weilands was motivated by Father Price's personal desire to visit casual friends. This is what the facts support, and there is no support for the proposition that the visit was to satisfy a priestly duty or to further the church business of the Archbishop or St. Isadore Church. Father Price's trips before and after his stop at the Weilands were not to fulfill a priestly responsibility; he was acting on his own time and at his own personal motivation. Because Father Price's trip during which the accident occurred was for personal reasons, as opposed to business reasons, the plaintiff may not recover from Father Price's em-

ployers. See *Wolfson Car Leasing*, supra; *Vanderlippe v. Midwest Studios*, 137 Neb. 296, 289 N.W. 341 (1939); Restatement (Second) of Agency § 235 and Comment a (1958).

While Father Price acts as an agent when he ministers to his parishioners or when he acts pursuant to the orders of the Catholic Archbishop, either of these situations is far removed from the facts of this case. Neither the Archbishop nor the St. Isadore Church ordered him to see the Weilands; his priestly duties did not require him to visit the Weilands; and no direct benefit would accrue to his employers as a result of such a visit.

The plaintiff argues that the law in Nebraska has developed so that the agency concept would apply in this case. She has submitted an affidavit by an expert in Canon Law and argued a line of cases to this effect. John T. Noonan, Jr.'s affidavit, states that although the "language from the constitution on the Church" indicates that the priest represents the Bishop before his particular parish, "it is plain from a more specific discussion of priestly duties in the Decree 'On the Ministry and Life of Priests' that the Priest's responsibilities to represent the Bishop go beyond the territorial limits of his parish." It is not necessary to detail his interpretation of this Decree; the implications of his interpretation are that all of a priest's associations with those Catholics—if not all persons—who reside in his diocese are on behalf of the Bishop. That is, a priest's associations with other Catholics within his diocese are all, by necessity and due to his priestly obligations, business. The law of agency in Nebraska does not reach this far. The law of agency distinguishes between a personal and a business activity, and an agent must be acting within the scope of his employment in order to hold his employer responsible for his acts. This distinction survives even though the employer has the power of extensive control over the employee's actions, cf. *Bissell v. McElligott*, 369 F.2d 115, 117–118 (C.A. 8th Cir. 1966), and even though the nature of a person's employment may

require that he work at any given time. Merely because all of one's associations *might* under some circumstances be considered work does not mean that they *must* always be. Moreover, the facts of this case conveniently lend to the distinction between a personal and a business activity.

The cases discussed by the plaintiff tend not to show the existence of an agency relationship here, but the absence of one. In *LaFleur v. Poesch*, 126 Neb. 263, 252 N.W. 902 (1934), the employee was found by the court to have been acting on the instructions of his employer; the employee "was required" by the terms and conditions of his job to make the trip during which the accident occurred. 126 Neb. at 276, 252 N.W. at 908. The present case contains no elements of a work requirement or even a work-related activity that motivated Father Price's trip. Moreover, the court in *LaFleur* indicated that an employer would be liable where the employee, acting within the scope of his employment, obeyed an express order of his employer, acted in the execution of the master's business, or performed an act "warranted by the express or implied authority conferred upon him, considering the nature of the services required, the instructions given, and the circumstances under which the act is done." To determine whether an act comes within the scope of employment, one must consider the attending circumstances, the "character of the employment," and the "nature of the wrongful act." See 126 Neb. at 275, 252 N.W. at 907. This standard is not met in the case at bar. In *Vanderlippe v. Midwest Studios*, supra, the Supreme Court of Nebraska found a jury question where the employee's act could conceivably have been motivated by a desire to serve his employer. There have been no facts alleged in this case to support such an inference. Finally, in *S.M.S. Trucking Co. v. Midland Vet, Inc.*, 186 Neb. 647, 185 N.W.2d 667 (1971), which the plaintiff labels "the most significant case on point," the situation is fundamentally different. The employee in *S.M.S.*:

". . . was pursuing his duties for the defendant just prior to the accident and

he was scheduled to again perform company business the following morning. *The business purpose of the trip was clearly shown.* The car he was driving at the time of the collision was owned exclusively by the defendant, having been given to Wegner to help conduct company business. The cumulative effect of this evidence was to show a business use of the car at the time of the accident, even though it may have been in combination with a personal purpose. . . ." (Emphasis added) 186 Neb. at 653, 185 N.W.2d at 670.

Some of the factors the court relied on in concluding that the cumulative effect of the evidence showed a business use of the car were that the employee involved was the general manager and president of the employer, that the employee was vested with broad management powers which were coextensive with the powers of the employer, and that there was no indication in the record that the car was used for anything other than business purposes. Furthermore, as noted by that court, the trip in question was sandwiched between business engagements. On this background, and the background that the statute of limitations had run against the employee, the Supreme Court of Nebraska stated:

". . . The mere fact that an agent was not, at the exact time of the accident, immediately pursuing the principal's business purposes does not necessarily take him out of the scope of employment. Such a question must be determined by looking at all of the relevant factors concerning the nature of the employment as well as the purpose and degree of any alleged deviation. . . ." 186 Neb. at 652, 185 N.W.2d at 670.

■ That the case at bar significantly differs from *S.M.S.* is apparent; in addition, none of the policy factors that would justify imposing liability on the employer under the doctrine of respondeat superior are present in the case at bar. For example, an employer cannot be expected to exercise control over the personal, as opposed to business, conduct and activities of his employees in order to protect third persons. See generally, *Kessler v. Bates & Rogers Construction Co.*, 155 Neb. 40, 44–45, 50 N.W.2d 553, 556 (1951).

## II.

The plaintiff moves for summary judgment in her favor on the issues of the negligence of Francis R. Price, the negligence of Robert McNeely, the contributory negligence of the plaintiff, and the assumption of risk by the plaintiff. The defendants resist, contending that when the facts are considered in their light most favorable to the defendants, there exist issues of material fact which require that the plaintiff's motion be denied. The defendants are correct in that the facts must be viewed in their light most favorable to the party against whom summary judgment is being sought. The following analysis, as did the preceding analysis, proceeds from that assumption.

### A. Negligence of Father Price

The material facts of this issue are not in dispute and may be summarized as follows: The accident occurred in the eastbound lane of Nebraska State Highway 32. Father Price was headed west and attempting to make a left turn in to the Weiland family driveway. It was a clear day and the road surface was dry. Highway 32 has a slight upward slope as one travels west; from the Weiland driveway the upgrade of the road continues for four or five blocks. Robert McNeely was driving the motorcycle east, and Cynthia Ambrosio, the plaintiff, was a passenger. As Father Price came within about 150 feet of the Weiland driveway, he began slowing down and put on his left turn signal. By the time he was opposite the driveway he had slowed to a speed of two to four miles an hour. He checked for oncoming traffic and, not seeing any, began to turn into the Weiland driveway; he had not come to a complete stop, but rather was "kind of coasting into the driveway." The McNeely motorcycle then hit his car. There had not been any obstructions to

block Father Price's view of the road, but the glare of the setting sun made it impossible to see the approaching motorcycle. Both Father Price and Robert McNeely had turned on their headlights prior to the collision.

For Father Price to be found negligent as a matter of law, the undisputed facts must show that he failed to act as an ordinarily prudent person would have acted in his circumstances. *Flordia v. Farlee*, 201 Neb. 39, 41, 266 N.W.2d 204, 206 (1978). The Supreme Court of Nebraska in *Flordia* set out the elements of negligence as follows:

> ". . . In order to constitute actionable negligence there must be a duty or obligation which the defendant is under to protect the plaintiff from injury; a failure to discharge that duty, and damages resulting therefrom. . . ." *Id.*

The court also noted that a motorist owes the same duty of care to a passenger in an approaching vehicle as he would to the driver of that vehicle.

■ Father Price owed a duty to the plaintiff not to proceed with the left turn until he could ascertain whether doing so would be safe. This is a strict standard of care which derives from two facts: First, the defendant Price owed a duty of care, because he sought to make a left turn; second, he owed an additional duty, because his vision was obstructed by the sun. A motorist making a left turn has a statutory duty to "yield the right-of-way to any vehicle approaching from the opposite direction," where that vehicle is "so close as to constitute an immediate hazard." Section 39–636, R.R.S.Neb. (Reissue 1978). A "left-hand turn across a favored public highway between intersections is a particularly dangerous" movement. *Rowedder v. Rose*, 188 Neb. 664, 667, 199 N.W.2d 18, 20 (1972). The degree of care that a motorist must exercise in making a left turn has to reflect this fact.

■ The special duty of care imposed by the left turn was augmented by the fact that the sun posed an obstruction to Father Price's vision. "[W]here the vision of the driver of an automobile is obscured . . . ,

it is his duty to stop until visibility is restored, or to reduce his speed and have his car under such control that he can stop immediately if necessary." *Murray v. Pearson Appliance Store*, 155 Neb. 860, 866–867, 54 N.W.2d 250, 255 (1952); see, also, *Anderson v. Robbins Incubator Co.*, 143 Neb. 40, 8 N.W.2d 446 (1943). Of the two courses of action approved by the Supreme Court of Nebraska—stopping and drastically reducing speed—only stopping until visibility is restored would satisfy the duty of care required of one who seeks to make a left turn, an inherently dangerous maneuver.

Father Price's depositions and those of the other parties involved establish that he breached his duty of care by turning left across a publicly favored highway between intersections, when his vision was obstructed by the sun and when another vehicle was approaching and dangerously close to the point at which Father Price intended to turn. Nebraska courts have found it negligence as a matter of law to make a left turn directly in front of an approaching vehicle, even without considerations of visual obstacles. *Flordia v. Farlee*, supra; *Bonnes v. Olson*, 197 Neb. 309, 248 N.W.2d 756 (1976). The court in *Bonnes* directed a verdict for the plaintiff motorist, and stated:

> "The evidence is uncontroverted in this case that the defendant was negligent in either failing to look for approaching vehicles eastbound on Maple Street within the radius of danger or, having looked, in failing to see the plaintiff's motorcycle. Our court has held in a well-established line of cases that if a driver 'fails to see one which is favored over him under the rules of the road, he is guilty of negligence as a matter of law.' . . . The duty of a driver of a vehicle to look for vehicles approaching on the highway implies the duty to see what is in plain sight. . . . The trial court did not err in failing to submit the issue of the defendant's negligence to the jury." 197 Neb. at 312, 313, 248 N.W.2d at 758–759.

■ The defendant Price argues that he did not fail to act as a reasonably prudent

man, because "a reasonable man would not have waited for the sun to set, nor would he have made a U-turn somewhere beyond the driveway so as to approach it from the opposite direction." He also argues that the issues of whether the motorcycle was in plain sight and whether it was within the radius of danger present questions of material fact. The foregoing exposition of Nebraska law refutes Father Price's first argument. As regards his second argument, the undisputed facts indicate that the motorcycle driven by McNeely was approaching the Weiland driveway at a speed within the legal limit and had been in plain sight for approximately four blocks, the distance it had traveled past the top of the previous incline in the road. Moreover, there were no obstacles, the glare of the sun aside, to block Father Price's view. Although he did not see the motorcycle, it was in plain sight within the meaning of the law. The motorcycle, furthermore, was within the radius of danger. None of the facts elicited would suggest otherwise. Summary judgment must be granted on this issue.

## B. Negligence of Robert McNeely

Father Price admits in his deposition that he could not see the approaching motorcycle or the collision because he was blinded by the sun. In addition, the testimony of Benedict Pfeifer, the one person who came closest to witnessing the accident, indicated that he could not see the collision because Father Price's car, which he had been watching, had just moved beyond his vision by going past the edge of the window; he did not see the motorcycle at all before the impact. The plaintiff herself was asleep at the time of the accident and has no knowledge of the events immediately preceding it. The only account of Robert McNeely's driving prior to the accident, and whether he was negligent, then, may be found in his reconstruction of the facts as set out in his deposition.

The accident occurred when the plaintiff and McNeely were driving a friend's mo-

torcycle back home to Madison, Nebraska, after a weekend outing with friends. The day before the accident the plaintiff and McNeely were cutting wood with their friends, the Stewarts, and three friends of the Stewarts', and on Saturday evening they attended a cookout at the Stewarts' home. The plaintiff stated that she consumed a can of beer Saturday night and a can of beer on Sunday morning and thought that McNeely "probably" did drink some beer on Sunday morning. Early Sunday evening the plaintiff and McNeely ate supper with the Stewarts, and neither she nor McNeely consumed any alcohol during dinner.

McNeely first saw the car driven by Father Price, heading west and signaling for a left turn, at a distance of about 500 feet from the point of impact. McNeely was then traveling about 40 miles an hour. It appeared to McNeely that the Price vehicle had stopped when McNeely was about 150 feet from it. Father Price indicated in his deposition that he did not stop, but actually slowed his vehicle to a speed of two to four miles an hour.[1] When he thought, erroneously, that the Price vehicle had stopped, McNeely began to turn the throttle to accelerate the motorcycle. This was at a distance of about 115 to 125 feet from the Price vehicle. McNeely then erroneously (for purposes of summary judgment) received the impression that the Price vehicle began to lurch forward to execute the left turn. McNeely received this impression just as he started to turn the throttle. He estimated his speed at this point as being 30 miles an hour. When he saw the car lurch forward, McNeely immediately applied his brakes. He estimated that he had traveled 30 feet from the time he first thought the Price vehicle lurched to the time he applied his brakes. In a different estimate, McNeely estimated that he applied his brakes at a distance of about 75 feet from the car, and stated

---

1. For purposes of summary judgment, it will be assumed that McNeely was mistaken in his impression that the Price vehicle stopped.

that the motorcycle could not have been going over ten miles an hour at the moment of impact. The motorcycle left 44 feet of skid marks.

When attempting to render aid to McNeely after the accident, Leon Weiland "clearly smelled the odor of beer or whiskey on the breath of said motorcycle driver." (affidavit of Leon J. Weiland, filing 51).

For purposes of summary judgment, it must be assumed both that McNeely had consumed a sufficient amount of alcohol so that Weiland could smell liquor on his breath shortly after the accident and that McNeely's judgment was faulty in perceiving that the Price automobile had stopped. These two facts, which may or may not reflect on each other, do not occur in isolation. For purposes of denying summary judgment, it is sufficient to point to the dispute of fact regarding whether the Price vehicle stopped, as McNeely contends, or whether it steadily continued creeping forward. If it continued forward, even when the relationship of the two vehicles started reaching a dangerous point, then reasonable minds might deduce that McNeely was given some warning or notice that Father Price was not aware of the precarious situation or was proceeding in spite of awareness. It is conceivable that a jury might reasonably find that McNeely had a reasonable opportunity to avoid the collision. McNeely was, after all, at least 75 feet or possibly 115 feet from the Price vehicle when it started the left turn. A reasonable opportunity to avoid the accident is especially possible in light of McNeely's admission that he had seen the Price vehicle with its turn signal on about 500 feet from the point of collision, and that he not only had an opportunity to observe but did observe the steady progress of the Price vehicle. The foregoing scenario is one not beyond the range of reasonable possibility, from the facts currently elicited. An even more extreme view of the facts would not be totally unreasonable—a reasonable jury might conclude that McNeely was aware of Father Price's situation but that McNeely decided that he could get past the Price automobile if he accelerated.

Clearly, the fact disputes about the progress of the Price vehicle and the judgment of McNeely, as well as the uncertainties regarding the relative distances of the motorcycle from the automobile when the automobile made certain movements, are all material factors in a decision about contributory negligence. This is clear from the principles about contributory negligence as a matter of law, as enunciated in the *Bonnes* case, supra:

"Our court has held that a plaintiff cannot be contributorily negligent where he has no reason to anticipate the entrance onto an arterial of an automobile from an intersecting road and *had no reasonable opportunity to avoid the ensuing accident.* . . .

"The plaintiff had the right to assume the defendant would use the highway in a lawful manner *until he was given warning or notice to the contrary.* . . ." (Emphasis added) 197 Neb. at 313, 248 N.W.2d at 759.

In *Bonnes*, the Supreme Court of Nebraska upheld a directed verdict for the plaintiff on the issue of contributory negligence where the undisputed facts were:

" . . . that the plaintiff first saw the defendant's automobile when it was 10 to 20 feet away. Whether the defendant's car was stopped at that time, or was moving at approximately 2 miles per hour, the defendant suddenly accelerated her automobile into the intersection where it was too late for the plaintiff to avoid the accident." *Id.*

Key facts like the foregoing, upon which the Supreme Court of Nebraska made its decision, are in dispute or absent in this case. Summary judgment must be denied.

*C.* Contributory negligence of and assumption of the risk by Cynthia Ambrosio

■ This portion of the plaintiff's motion for summary judgment does not need extensive deliberation. There is a fact dispute about the alcoholic condition of Robert

McNeely, and there exists a genuine issue about whether McNeely was contributorily negligent with respect to the accident. Moreover, the plaintiff was with McNeely the preceding day and a half and therefore was in a position to assess his alcoholic condition, if he had one, and his fitness to drive. In the context of the foregoing facts and issues, there does exist an issue of whether the plaintiff was contributorily negligent or assumed the risk by riding with McNeely.

Where evidence of drinking by the driver of a vehicle is shown, along with the possibility of negligent conduct on the driver's part and the passenger's awareness of the driver's possibly intoxicated condition, a claim of contributory negligence and assumption of the risk on the part of the passenger has been stated. The Supreme Court of Nebraska has made this clear in *Raskey v. Hulewicz*, 185 Neb. 608, 177 N.W.2d 744 (1970):

" . . . There [*Schaffer v. Bolz*, 181 Neb. 509, 149 N.W.2d 334 (1967)], as here, there was evidence as to the extent of consumption of alcoholic beverages by both parties but no direct evidence as to the effect this would have on the defendant's driving ability. It was there stated: 'A guest may be guilty of contributory negligence, or assumption of risk, by riding or continuing to ride with a driver who he knows, or in the exercise of ordinary care and diligence should know, is so intoxicated that he is unable to operate the vehicle with proper prudence or skill. * * * The defendants did not allege that Farrell was intoxicated; no witness testified that he was intoxicated; and the plaintiff testified that Farrell was not intoxicated. Whether Farrell was intoxicated and the extent to which his condition was apparent were inferences to be drawn from all of the evidence in the case. We think the trial court was correct in holding that these were questions for the jury.'" 185 Neb. at 610–611, 177 N.W.2d at 747.

The plaintiff seeks to distinguish the *Raskey* case by contending that the "only evidence of drinking by McNeely on the day of the accident is a one-sentence statement by Weiland that he smelled alcohol on McNeely's breath when he rendered aid to McNeely at the scene of the accident." Plaintiff's reply brief, p. 14. The Weiland statement is sufficient to create a factual dispute, especially in light of the statements about drinking earlier in the weekend and the plaintiff's statement that McNeely "probably" had a beer on Sunday. The plaintiff is incorrect when she asserts that there is no evidence to support a finding that McNeely was intoxicated on the trip during which the accident occurred.

The plaintiff cites *Floyd v. Edwards*, 150 Neb. 41, 33 N.W.2d 555 (1948), where the Supreme Court of Nebraska concluded that it was improper for the trial court to submit the issues of intoxication and contributory negligence to the jury. The court stated that there was "no competent evidence . . . which could possibly sustain any finding that deceased was intoxicated or guilty of any contributory negligence." 150 Neb. at 46, 33 N.W.2d at 559.

There does exist competent evidence in this case, however, regarding intoxication. The point need not be belabored. The *Floyd* case involved significantly different evidence, and the evidence being held incompetent with respect to the decedent's drinking there could not reasonably support the inference of intoxication. The evidence in that case was as follows:

"The driver testified that after the accident: 'I noticed a slight alcoholic odor. * * * I didn't make any examination, only I did just catch an aroma. * * * I caught the odor.' However, he did not know whether the odor came from the breath or body of the injured man, or where it came from.

"A taxicab driver testified that she saw deceased sometime between 10 and 11 P.M. walk out and stand behind a car between Fourth and Fifth Streets. She said he 'looked like he was just getting ready to cross the street. * * * I said "Hello, Art," and he said hello.' She did not stop to talk to him or anything. She

was asked: 'Q. Did he look like he had been drinking? A. I thought he did. * * * Q. All you did is you walked by him, said hello, he walked out, stood there on the paving, yet you want to tell the jury he was drunk? A. No, I thought he had been drinking.' She didn't 'smell anything,' 'didn't see him drink anything,' or 'wobble or anything,' and she could not 'tell anything from his talk.'

"Concededly, when the body got to the undertaking parlors, his clothes were removed and a flat, broken, pint-size ordinary-type whisky bottle was found therein, and there was the odor of liquor from saturation of his clothes. Whether or not the bottle was still sealed or had been previously opened, and whether or not deceased ever consumed anything from the bottle or drank any liquor prior to the accident, was not shown. The undertaker and the county attorney both testified that there was no odor of alcoholic liquor on the body, but that it was from his clothes. The persons who saw deceased while he was still living and breathing heavily had no recollection of smelling liquor upon his breath.

"In rebuttal, a friend and chum of deceased testified that he saw him about 20 minutes before the accident, at which time deceased was normal. He testified that he never knew of him drinking whiskey, and that deceased was absolutely not intoxicated. Members of the family of deceased testified that they never saw or heard of him drinking whiskey." 150 Neb. at 45–46, 33 N.W.2d at 558–559

Summary judgment must be denied on this issue.

The defendants requested oral argument on their motion for summary judgment. This will be denied.